# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| BRIDGETT R. McGILL, | ) | 1:11cv0542 DLB |
| | ) | |
| | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## BACKGROUND

Plaintiff Bridgett R. McGill ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed her application on July 12, 2007, alleging disability since August 13, 1998, due to post traumatic stress disorder ("PTSD"), high blood pressure and right leg pain. AR 125-131, 143-149. After her application was denied initially and on reconsideration, Plaintiff

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

requested a hearing before an Administrative Law Judge ("ALJ").  AR 66, 76, 96.  ALJ Sharon Madsen held a hearing on July 9, 2009, and issued a decision denying benefits on December 11, 2009.  AR 6-16, 17-65.  The Appeals Council denied review on January 28, 2011.  AR 1-4.

Hearing Testimony

ALJ Madsen held a hearing on July 9, 2009, in Fresno, California.  Plaintiff was not represented by an attorney.  Vocational expert ("VE") Thomas Dachelet and witness Marvin Graham also appeared and testified.  AR 17.

Plaintiff testified that she was born in 1966.  She received disability benefits previously for depression and PTSD, but they ended when she was incarcerated in October 2006.  AR 27.  Plaintiff is separated from her husband because he beat her and she hasn't seen her kids in 15 years.  AR 28-29.  Plaintiff lives in a trailer with her friend and was receiving food stamps and general relief.  AR 29.  Plaintiff does not have a driver's license and tries to walk when she needs to go errands or appointments.  AR 29.  She cannot walk now because of her leg, however, so she hasn't been going anywhere.  AR 30.

Plaintiff completed the sixth grade.  She was in prison from February 2009 to May 2009 for "credit debt."  AR 30, 45.  She also served a year in 2006 and was in and out between 2007 and 2009.  AR 31.  Plaintiff used cocaine growing up and some incarcerations were based on a failure to complete a program.  AR 46.

Plaintiff testified that she cannot bend down because of her legs and she can't do many household chores.  She can do a few dishes and some pick-up.  She does not cook but can make a sandwich or a bowl of cereal.  AR 31-32.  She also shops.  AR 32.  Plaintiff does not like to go out too much anymore because she "[has] a lot of things happening to [her]" and gets nervous around people sometimes.  She's also been having a lot of nightmares and is afraid of knives.  AR 32, 51.

During a typical day, Plaintiff watches television a lot.  She cannot read.  She also goes to the Hope House, where they offer games, counseling and computers.  She also sleeps a lot during the day.  AR 33.

1   Plaintiff worked for Taco Bell for 3 months in the 1990s, but became depressed and
2 stopped working.  She also received income from the Madera Convalescent Hospital for washing
3 dishes.  AR 34.  She also worked at McDonalds cooking french fries but burned herself and had
4 to stop.  AR 34.

5   When asked about her leg, Plaintiff could not remember what the doctors told her was
6 wrong, but she said she might need an operation.  AR 35.  Plaintiff has pain in her knee all day.
7 The pain goes into her hip and sometimes down to her toes.  She has a cane, but forgot to pick it
8 up.  AR 35-36.  Plaintiff was taking Lortab and Tramadol for pain.  She tries to keep her foot up
9 but can't hold it up for long because of pain.  She also cannot bend the leg and the foot is
10 swollen.  Walking and standing too long aggravate the pain.  AR 36-37.

11   Plaintiff also has high blood pressure, asthma and diabetes.  AR 37.  Plaintiff uses her
12 inhaler 3 times a day and although she still smokes, she smokes less.  AR 38.  She spent 7 days in
13 the hospital recently because her asthma got really bad.  Plaintiff was not taking medication for
14 diabetes.  AR 40.

15   Plaintiff was also taking Trazodone to help her sleep and had taken medication for
16 depression years ago.  AR 41.  Plaintiff explained that she feels sad and has nightmares about her
17 father, who raped her when she was 11, put her in a closet for 2 weeks and sold her to a pimp.
18 AR 42.  Her brother also cut her arm and stabbed her in the back.  She explained that in her
19 nightmares, she feels like her father is coming to get her.  She is sometimes scared to go to sleep,
20 but the medication helps.  AR 42.  Plaintiff also thinks about suicide and was hospitalized 8
21 times for suicide attempts.  The most recent hospitalization was last year.  AR 43.

22   Plaintiff has a hard time remembering sometimes.  She doesn't have too many friends
23 anymore because it is hard for her trust people and she's always afraid something will happen to
24 her.  AR 45.  She sees a doctor for medications and a counselor once a month for individual
25 therapy.  AR 46-47.  She also goes to group therapy at the Hope House.  AR 47.

26   Plaintiff thought that she could carry one gallon of water.  She can sit down, but her knee
27 hurts when she bends her legs.  AR 49.  Plaintiff thought that she could stand for about 5 minutes
28 and walk for half of a block.  AR 50.

3

Marvin Graham, who has known Plaintiff for at least 23 years, also testified. AR 53. When asked what he could add to Plaintiff's testimony, Mr. Graham confirmed that Plaintiff jumped out of his car "scared" and for no reason, years ago. He also has to calm her down when he cuts chicken with a knife because she gets scared. AR 54-55. Plaintiff also "gets suicidal" and runs into the middle of traffic. AR 55.

Mr. Graham lives with Plaintiff and testified that she doesn't take her medication like she should. AR 55. Mr. Graham reminds her to take her medication. Plaintiff becomes very unpredictable, where she's fine one minute and terrible the next, and Mr. Graham fears for himself. AR 56. He also explained that Plaintiff always talks about things that happened in the past and how she is in the world by herself. AR 56, 59.

For the first hypothetical, the ALJ asked the VE to assume a person of the same age, education and background, with no exertional limitations but with a limitation to simple, routine tasks. AR 60. Plaintiff could perform her past work in fast food as a dishwasher or cook. Plaintiff could also perform the medium jobs of extractor/operator and packager. AR 60-61.

For the second hypothetical, the ALJ asked the VE to assume a person who could lift and carry 60 pounds occasionally, 25 pounds frequently, and sit, stand and walk for 6 hours, with a limitation to simple, routine tasks. The VE testified that the same positions would be available. AR 62.

For the third hypothetical, the ALJ asked the VE to assume a person who could lift and carry 20 pounds occasionally and 10 pounds frequently, and sit, stand and walk for 6 hours, with a limitation to simple, routine tasks and limited or occasional public contact. The VE testified that this person could not perform Plaintiff's past relevant work but could perform the unskilled, light positions of bagger, garment sorter, and grader. AR 62.

For the fourth hypothetical, the ALJ asked the VE to assume a person who could lift 20 pounds occasionally and 10 pounds frequently, sit, stand and walk for 2 hours, with occasional crouching. This person would be limited to simple, routine tasks and limited public contact. The VE testified that this person could perform the sedentary positions of ampule sealer, loader of semi-conductor dies and weight tester. AR 62-63.

If the ALJ added an inability to concentrate for more than 30 minutes to the fourth hypothetical, there would be no work available. AR 64.

Medical Record

Plaintiff was seen on February 27, 2004, at the Madera County Department of Mental Health for a psychiatric evaluation. Plaintiff reported that she was hearing voices and was depressed since she stopped taking her medications. Plaintiff's affect was constricted and her mood was depressed. Plaintiff reported auditory hallucinations, though the rest of her mental status examination was normal. Orlando T. Collado, M.D., diagnosed major depression with psychotic features and found a current GAF of 40. Dr. Collado started Plaintiff on Effexor and Seroquel and referred her to therapy. AR 205-206.

Plaintiff returned to Dr. Collado on March 30, 2004, and reported hearing more voices and problems with her memory. Her affect was blunted and her mood was depressed. Dr. Collado noted minimal improvement. She was instructed to increase her medications. AR 207.

On May 26, 2004, Plaintiff reported that she was able to cope with stressors better and was hearing less voices. Her memory problems continued, however. On examination, her affect was blunted and her mood was depressed. Dr. Collado instructed her to continue her medications and return in 8 weeks. AR 209.

Plaintiff did not return to Dr. Collado until February 1, 2005. She was out of medication and was having increased hallucinations, trouble sleeping and continued memory problems. Plaintiff was not compliant with her medication. Her affect was blunted and her mood was depressed. Judgment was mildly impaired. Her diagnoses remained the same and she was instructed to continue Effexor and Seroquel. AR 211.

California Department of Correction ("CDC") treatment notes dated May 30, 2006, indicate that Plaintiff appeared in distress. Her affect was congruent and she appeared to be having a difficult time coping because she was worried about her husband and children. Plaintiff's attention and concentration were poor. The staff psychologist noted that Plaintiff would continue to receive structure and support. AR 243.

CDC treatment notes indicate that Plaintiff appeared depressed on June 5, 2006. AR 251. She appeared "slightly stressed" on June 19, 2006, and her attention and concentration were average. AR 249.

On November 16, 2007, Plaintiff was seen by Greg Hirokawa, Ph.D., for a consultive psychiatric evaluation. Her participation effort was "marginal," but her behavior was cooperative. Plaintiff reported depression, anxiety and bipolar disorder and complained of poor sleep, learning problems, memory problems and poor concentration. Plaintiff reported 7 psychiatric hospital admissions and 4 prior suicide attempts, though she was not currently receiving mental health treatment. On mental status examination, Plaintiff's mood appeared mildly depressed and she denied currently suicidal ideation. Plaintiff was oriented times 3 and her intellectual functioning appeared to be within the below average range. Recent and past memory was intact, though Plaintiff was not able to name the capital or governor of California. She also reported that there were 13 months in a year and indicated that she didn't understand when Dr. Hirokawa asked her how many days were in a week. She could not perform simple calculations, but she could perform a simple three-step command. Concentration for conversation was adequate. AR 253-256.

Dr. Hirokawa diagnosed depressive disorder, not otherwise specified and generalized anxiety disorder, rule out bipolar disorder, type II and learning disability. He also diagnosed antisocial personality disorder, rule out low average intellectual functioning. Dr. Hirokawa explained that Plaintiff's participation effort was questionable because she was not able to answer questions frequently answered. Plaintiff did appear to have a learning disability and low average intellectual functioning. Her depression was within the mild range and she appeared to have a personality disorder. Dr. Hirokawa opined that Plaintiff would have mild to moderate limitations in all areas of work function. The likelihood of emotional deterioration was minimal to moderate. AR 256-258.

On December 13, 2007, State Agency physician Kelly J. Loomis, M.D., completed a Psychiatric Review Technique form. Dr. Loomis opined that there was insufficient evidence to determine whether Plaintiff's mental impairment was severe. In an accompanying case analysis,

6

Dr. Loomis noted that her participation in the consultive examination was questionable, and that although she has a history of mental health issues, she was not always compliant with her medication and treatment. Plaintiff also failed to attend a physical examination despite a rescheduled appointment. AR 259-271.

On February 22, 2008, Plaintiff underwent a suicide risk assessment at CDC for the formulation of a treatment plan. Plaintiff told D. Dunkel, Ph.D., that she attempted suicide 8 times from age 11 to one year ago by taking pills, cutting her forearm, hanging and jumping into traffic. She has had no suicidal ideation for the past year and was deemed a low risk. On mental status examination, Plaintiff was cooperative. Her affect was constricted and anxious. Plaintiff's mood was dysphoric. Intellectual functioning was below average and attention and memory were impaired. She reported "seeing" her mother all the time and hearing her father's voice. Insight was limited and judgment was poor. Dr. Dunkel diagnosed PTSD, depressive disorder, not otherwise specified, and cocaine dependence in remission. He recommended a medication evaluation as well as group treatment for stress, anxiety and depression. AR 274-285.

On March 4, 2008, Plaintiff saw CDC physician Dr. Foin. On mental status examination, Plaintiff was cooperative. Her affect was appropriate and her mood was euthymic. Plaintiff reported her sleep as fair and her appetite as good. Plaintiff had paranoid delusions which were described as "hypervigilant." She also reported that sometimes, she hears her father's voice. Plaintiff's intellectual functioning was found to be within normal limits, although Plaintiff reported that she cannot read or write. Concentration, attention and memory were impaired and insight and judgment were limited. Dr. Foin diagnosed PTSD, depressive disorder, not otherwise specified, and cocaine dependence in remission. Group therapy was recommended. AR 277-278.

CDC notes from March 17, 2008, indicate that Plaintiff was temporarily assigned a bottom bunk. Plaintiff was also banned from working with boiling water and chemicals, and driving a vehicle or machine. AR 340.

On April 29, 2008, State Agency physician Wesley G. Jackson, M.D., affirmed the prior finding of insufficient evidence. AR 293.

On May 1, 2008, State Agency physician Allen H. Middleton, Ph.D., completed a Mental Residual Functional Capacity Assessment form. Dr. Middleton opined that Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions and in her ability to interact appropriately with the general public. She was not significantly limited in any other area. Dr. Middleton believed that Plaintiff was capable of understanding and following simple directions, but would have difficulty with detailed directions. She was also capable of relating to coworkers and adapting to the usual changes of a work setting, but needed reduced work with the general public. AR 294-296.

Dr. Allen also completed a Psychiatric Review Technique form and opined that a residual functional capacity ("RFC") assessment was necessary. He opined that Plaintiff had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace. AR 297-307.

Plaintiff was seen at Madera County Behavioral Health on July 17, 2008. She reported being homeless since May. She was not taking any medications. On mental status examination, Plaintiff's affect was blunted and her mood was depressed. Her speech was slowed and recent memory was impaired. Judgment and insight were moderately impaired. Her plan of care included medication services and individual and group treatment. AR 326-329.

On September 19, 2008, Plaintiff was discharged from Madera County Behavior Health Services after 2 months of treatment because of incarceration. Her condition was listed as "worse" and her prognosis was "fair." The listed diagnoses were major depressive disorder, recurrent, severe, without psychotic features and PTSD. AR 324.

Notes from CDC indicate that Plaintiff was given a brace for her right knee and a cane on May 20, 2009. Plaintiff could not walk for more than 100 yards and could not squat for 4 weeks. She was also assigned to a bottom bunk. AR 316.

An x-ray of Plaintiff's right knee taken on May 27, 2009, revealed mild multicompartmental degenerative joint disease and a small suprapatellar effusion. AR 337.

Plaintiff was seen at Community Medical Center in July 2009 for chest pain and pain in the right leg. A chest x-ray showed a mildly enlarged heart and her knee had degenerative

changes due to age, weight and extra fluid. She was instructed to take pain medications as needed. AR 320, 361-362.

Also in July 2009, Plaintiff was prescribed 3 weeks of physical therapy for gait training and lumbar stabilization. AR 321.

Plaintiff underwent an MRI of her right knee on August 10, 2009. The exam revealed generous effusion of the right knee joint and a complex tear of the posterior horn menial meniscus. AR 374.

From July 2007 through September 2009, Plaintiff received treatment at Madera County Hospital for various ailments, including right knee and back pain. AR 378-598.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of depressive disorder with psychotic features, PTSD, personality disorder, obesity, and right knee degenerative joint disease and torn meniscus. Despite these impairments, Plaintiff retained the RFC to lift and carry 20 pounds occasionally, 10 pounds frequently, sit, stand and/or walk 6 hours each, and perform simple, routine tasks with limited public contact. With this RFC, Plaintiff could perform a significant number of jobs in the national economy. AR 11-15.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. E.g., Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

1  This Court must uphold the Commissioner's determination that the claimant is not disabled if the
2  Commissioner applied the proper legal standards, and if the Commissioner's findings are
3  supported by substantial evidence.  See *Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d
4  509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(g).  Applying the process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" (depressive disorder with psychotic features, PTSD, personality disorder, obesity, right knee degenerative joint disease and torn meniscus) based on the requirements in the Regulations (20 CFR §§ 404.1520(c), 416.920(c)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) has no past relevant work; but (5) can perform jobs that exist in significant numbers in the national economy.  AR 11-15.

Here, Plaintiff argues that the ALJ improperly assessed the testimony of Marvin Graham.

10

**DISCUSSION**

Plaintiff argues that the ALJ improperly analyzed Martin Graham's testimony. Plaintiff contends that Mr. Graham's testimony, if fully credited, demonstrates that Plaintiff cannot work because of her mental impairment. In making this argument, Plaintiff contends that her own testimony is unreliable because of her personality disorder and that the ALJ must therefore "rely on the third party evidence as well as the facts of one's life and the observations of qualified professionals. . ." Opening Brief, at 13.

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (citing *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir.2006)). Such testimony is competent evidence and "cannot be disregarded without comment." *Id.* (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996)). If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons "that are germane to each witness." *Id.* Further, the reasons "germane to each witness" must be specific. *Stout*, 454 F.3d at 1054 (explaining that "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony").

The ALJ, however, need not discuss all evidence presented. See *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir.1984). Rather, he must explain why "significant probative evidence has been rejected." *Id.* (*citing Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir.1981)). Lay witness testimony which is neither significant nor probative may be properly ignored. *See id.* at 1395. Similarly, third party testimony which is unsupported or controverted by medical evidence may be rejected. See *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir.2005).

Here, the ALJ summarized Mr. Graham's testimony and found as follows:

> The claimant's friend, Marvin Graham, states that the claimant is able to prepare simple meals, sweep, clean, go outdoors, shop, manage money and socialize. These statements have been given substantial weight. The other observations of Marvin Graham are mostly vague and unquantified; for example, the claimant feels bad about her life. These statements have been given little weight and the opinion of consultive psychologist Dr. Hirokawa has been given greater weight.

AR 14.

1    Plaintiff first argues that the ALJ misstates Mr. Graham's testimony about Plaintiff's
2 daily activities. Plaintiff contends that Mr. Graham "did not testify that McGill [can] 'prepare
3 simple meals, sweep, clean, go outdoors, shop, manage money, and socialize,' but that she
4 forgets a lot, has no social activities, does not listen well and he has to repeat things over and
5 over again and does not trust others and will take nice or benign comments and respond
6 offensively." Opening Brief, at 14.
7    Plaintiff cites a Third Party Function Report completed by Mr. Graham on February 1,
8 2008. AR 174-179. While the report repeats much of his testimony about Plaintiff's
9 preoccupation with her past, forgetfulness and dislike of people, it also states that Plaintiff
10 prepares simple meals, sometimes sweeps and cleans, goes out during the day, uses public
11 transportation, goes shopping, and manages her money.[2] AR 174-175. Plaintiff contends that
12 these activities do not translate into an ability to perform sustained work activity, and although
13 this may be true, it does not prevent the ALJ from examining this testimony to determine if
14 Plaintiff is more functional than she alleges. *See eg.*, *Valentine v. Comm'r Soc. Secy.*, 574 F.3d
15 685, 693 (9th Cir. 2009) ("The ALJ recognized that this evidence did not suggest Valentine could
16 return to his old job at Cummins, but she thought it did suggest that Valentine's later claims
17 about the severity of his limitations were exaggerated."). For example, in contradiction to Mr.
18 Graham's statements, Plaintiff stated just days earlier that she does not prepare any meals, does
19 not shop and is not able to handle money. AR 163-164.
20    Next, Plaintiff argues that the ALJ incorrectly characterized Mr. Graham's statements as
21 vague. According to Plaintiff, his statements "describe an individual that has severe
22 interpersonal conflicts and cannot deal at all with other people causing even her friends that she
23 relies on to fear her." Opening Brief, at 14. His testimony related to her jumping out of his car
24 years ago, and his description of her as suicidal and sad, is not necessarily probative of how
25 Plaintiff's impairments impacted her ability to work. Rather, as the ALJ explained, the testimony

---

[2] Plaintiff appears to be correct that Mr. Graham did not testify that Plaintiff socializes. Under "Social Activities," in answering whether Plaintiff spends time with others, Mr. Graham originally marked, "Yes," and then crossed it out and marked, "No." This single misstatement, however, does not undermine the overall analysis based on his reports of Plaintiff's other daily activities.

12

was vague, at best. See *Bruce v. Astrue,* 557 F.3d 1113 (9th Cir. 2009) (ALJ required to consider and comment upon lay witness testimony, as it concerned how claimant's impairments impact his ability to work). Insofar as Mr. Graham was specific in how Plaintiff's impairments impacted work activities, i.e., her forgetfulness and her dislike of people, these limitations were taken into consideration in the RFC finding that Plaintiff was limited to simple, routine work with limited public contact.

Finally, Plaintiff faults the ALJ for giving weight to Mr. Graham's testimony related to Plaintiff's failure to always remember to take her medication. The Court agrees that questioning a claimant with a mental impairment on the basis of a failure to comply with treatment is not proper. *Nguyen v. Chater,* 100 F.3d 1462, 1065 (9th Cir. 1996). Nonetheless, any error is harmless because it does not invalidate the overall analysis of Mr. Graham's testimony. *See eg.*, *Batson v. Barnhart*, 359 F.3D 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility determination even though one reason may have been in error). This is especially true given the ALJ's analysis of Plaintiff's similar testimony. Although she characterizes her testimony as unreliable, she does not challenge the ALJ's credibility finding.

To the extent that Plaintiff contends that Dr. Hirokawa found "significantly more limitations" than just a limitation to simple, routine tasks with limited pubic contact, her argument is without merit. Opening Brief, at 15. Dr. Hirokawa opined that Plaintiff was "mildly to moderately limited" in all categories of work function. This does not necessarily mean that each mild to moderate limitation requires its own limitation in the RFC. As is often the case, many areas of limitation are subsumed within a single limitation in the RFC. Nonetheless, the State Agency physician reviewed Dr. Hirokawa's opinion and determined that Plaintiff could follow and understand simple directions, and relate and adapt in a work setting with limited public contact. The ALJ relied on both Dr. Hirokawa's opinion and that of the State Agency physician, and Plaintiff does not challenge this analysis.

Based on the above, the Court finds that the ALJ gave specific, germane reasons for rejecting Mr. Graham's testimony. The analysis is free of legal errors and is supported by substantial evidence.

**CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Bridgett R. McGill.

IT IS SO ORDERED.

Dated:   **January 23, 2012**                              /s/ **Dennis L. Beck**
                                                                        UNITED STATES MAGISTRATE JUDGE